AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information associated with One (1) Target | )   Case No.  MJ22-219 |
| Accounts/Identifiers (TT16), for Investigation | ) |
| of 21 U.S.C. § 841 & 846 and Other Offenses | ) |

### APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A1, located in the Western District of Washington and elsewhere, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841 & 846 | Distribution and Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits. Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:

☒ by reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Ryan C. Smith, Special Agent DEA
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or

☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone.

Date: May 18, 2022

_____
*Judge's signature*

Paula McCandlis, United States Magistrate Judge
*Printed name and title*

City and state: Bellingham, Washington

USAO 2021R01230

**ATTACHMENT A1**

**Property to Be Searched and Subscriber/Subject Information**

Records and information associated with the following cellular telephones

a. **Target Telephone 16 (TT16)**, assigned call number (206) 671-9948, subscribed to "Alex DIAZ" at 3926 Lozier Lane, SE Auburn, Washington, whose service provider is T-Mobile, a wireless service provider. T-Mobile is headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

In Attachment B, T-Mobile is referred to as the Wireless Provider.

## ATTACHMENT B
### Particular Things to Be Seized

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A1. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.    **Section I:  Information to be Disclosed by as the Wireless Provider**

1.    **Subscriber/Account Information.** The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

a.    Names (including subscriber names, user names, and screen names);

b.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.    Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

d.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

e.    Length of service (including start date) and types of service utilized;

f.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Telephone described in Attachment A1 for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A1.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A1.

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Telephone described in Attachment A1 for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A1.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A1.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider. The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

furnishing such facilities or assistance.

**II.**     **Section II:  Information to Be Seized by the Government**

1.      All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.      All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.      Location Information regarding the Target Telephone described in Attachment A1.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

Attachment B
Page 3 of 3
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR TRACKING WARRANTS AND PEN-TRAP ORDERS

STATE OF WASHINGTON )
                       )    ss
COUNTY OF WHATCOM )

I, Ryan C. Smith being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

### Application for a Tracking Warrant for Two Target Cell Phones

1.      I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephone (hereafter, the "**Target Telephone**"):

a.      **Target Telephone 16 (TT16)**, assigned call number (206) 671-9948, subscribed to "Alex DIAZ" at 3926 Lozier Lane, SE Auburn, Washington, whose service provider is T-Mobile, a wireless service provider. T-Mobile is headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. **TT16** is described herein and in Attachment A1, and the location information to be seized is described herein and in Attachment B. Investigators believe that **TT16** is being used to facilitate drug trafficking.

### ECPA

2.      The Court has jurisdiction to issue the proposed warrants under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is the Western District of Washington, a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

### Pen Register Act

3.      Because this warrants seek the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or

AFFIDAVIT OF SA Smith - 1
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

4.     The Court has jurisdiction to issue the requested pen-trap orders because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

5.     This application includes all the information required by the Pen Register Act.  *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Stephen Hobbs that (1) identifies the Drug Enforcement Administration as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency.  18 U.S.C. § 3122(b). The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

6.     A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

7.     In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers.  The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act.  Accordingly,

AFFIDAVIT OF SA Smith - 2
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the **Target Telephone** without geographic limit.

8.      The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachments B of the requested warrants that T-Mobile, and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by the Drug Enforcement Administration, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

9.      This is the first application in this judicial district for a search warrant authorizing disclosure of the above information for **Target Telephone 16** in connection with this investigation.

10.      **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

### Application for Tracking Warrants for Target Vehicles

11.      I am also submitting this Affidavit pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of a warrant application to install and monitor a GPS tracking device on two vehicles. There is probable cause to believe the vehicles are being utilized by the same unidentified individual to traffic controlled substances in violation of Title 21 of the United States Code, and that obtaining the information sought in the warrant will advance an investigation into those offenses.

12.      This affidavit supports an application for a warrant authorizing the real-time location tracking of the following vehicles for a period of 45 days:

AFFIDAVIT OF SA Smith - 3
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a. **Target Vehicle 6 (TV6)**: is a white, 2008 Nissan Pathfinder, bearing Washington license plate CBZ3100 (hereinafter, "**Target Vehicle 6**" or "**TV6**"). According to Washington Department of Licensing, **Target Vehicle 6** is registered to "Joshua L. Phair" at 2998 Smokehouse Road, Bellingham, Washington, 98226.

b. **Target Vehicle 7 (TV7)**: is a silver, 2008 Nissan Murano, bearing Washington license plate CBN9370 (hereinafter, "**Target Vehicle 7**" or "**TV7**"). According to Washington Department of Licensing, **TV7** is registered to "Marie Guizelle JOHNSON" at 2360 S Ash Street, Tacoma, Washington.

13. We request permission to install/service the tracking devices at any time, day or night, in order to ensure that we can do so covertly and avoid jeopardizing the ongoing investigation. Investigators believe it would be safer for investigators to install the tracking devices during hours of darkness, to ensure the tracking devices are installed in a covert manner. The above listed addresses are houses with windows that oversee their respective parking areas, making it unlikely that investigators will be able to install or maintenance the tracking device in a covert manner during daylight hours. Because we believe early morning hours or later evening hours are the safest time for installation and access to the vehicle, we request nighttime authorization.

14. I seek authority to do the following: (a) install, remove, monitor, repair, or adjust a global positioning satellite (hereinafter GPS) electronic tracking device on to **TV6** and **TV7** at any time of the day or night; (b) if necessary to protect the safety of persons installing, removing, monitoring, repairing, or adjusting the electronic tracking device(s) on **TV6** or **TV7**, or to protect the integrity of the investigation, to surreptitiously enter the subject vehicles at any time of the day or night, and move the subject vehicles from one location to another for the purpose of installing, removing, monitoring, repairing, or adjusting the devices; and/or to tow the vehicles; (c) surreptitiously re-enter **TV6** or **TV7** at any time of the day or night, for the purpose of installing, removing, monitoring, repairing, or adjusting the devices; and (d) continuously monitor any and all signals emitted from the electronic tracking devices in any jurisdiction within the United States, including when the vehicle enters any structure or

AFFIDAVIT OF SA Smith - 4
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

private property in which there may be a reasonable expectation of privacy. I request this authorization for a period of up to forty-five (45) days.

15.     I make this request based on the evidence described below, which establishes probable cause to believe that **TV6** and **TV7** are involved in criminal activity, specifically drug trafficking in violation of 21 U.S.C. §§ 841 and 846, and that the information collected pursuant to the warrant will include evidence of violations of 21 U.S.C. §§ 841 and 846.

16.     This is the first application in this judicial district for a tracking warrant for **TV7**, and the second application in this judicial district for a tracking warrant for **TV6** in connection with this investigation.

## AGENT BACKGROUND

10.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Bellingham, Washington Resident Office.  In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, *et seq*.).  I have been employed as a Special Agent with the DEA since March 2017.  Prior to becoming a Special Agent, I was a detective in the Special Victims Unit, a police motorcycle officer, and a police patrol officer with the Hoover Police Department in Hoover, Alabama. In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance and executions of search warrants.

11.     I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking.  I have participated in narcotics investigations at both the local and federal level, and I have participated in the execution of federal search warrants.  As a result, I have become familiar with methods of operation of drug traffickers and organizations.  As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers

in investigations of violations of federal and state controlled substance laws, including the investigation of cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, heroin, fentanyl, marijuana, and other dangerous drugs.

12.     I have interviewed numerous drug dealers, drug users, and knowledgeable confidential informants about the lifestyles, appearances, and habits of drug dealers and users.  I have become familiar with the manner in which narcotics traffickers smuggle, package, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.  I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, internet, pagers, coded communications, slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities and mislead law enforcement investigations.  I have had discussions with other law enforcement personnel about the packaging and preparation of narcotics, the methods of illegal narcotics traffickers, and the security measures that narcotics traffickers often employ.  I have examined narcotics customers' supplier lists, pay/owe ledgers maintained by traffickers, and other documentation related to narcotics trafficking.  I have also examined documentation of various methods by which methamphetamine, cocaine, marijuana, heroin, and other illicit drugs are smuggled, transported, and distributed.  I have participated in hundreds of hours of surveillance of narcotics traffickers.  During surveillance, I have personally observed narcotics transactions, counter surveillance techniques, and the ways in which narcotics traffickers conduct clandestine meetings.

13.     Through my participation as a case agent in Title III investigations, I have gained knowledge and experience conducting investigations utilizing the interception of wire and electronic communications. I have been involved with the review and decoding of veiled intercepted conversations between narcotics traffickers that were subsequently substantiated. Throughout my career in law enforcement, I have received training from, worked with, spoken with, and gleaned knowledge from several experienced federal,

AFFIDAVIT OF SA Smith - 6
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

state, and local narcotics officers concerning the use of cell phones by drug traffickers to facilitate drug trafficking activities.

14.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and pen-traps, and therefore does not set forth all of my knowledge about this matter.

15.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, have been committed, are being committed, and will be committed by the user of **TT16**, and that the **Target Telephone** described herein has been used in furtherance of those offenses. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

16.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, have been committed, are being committed, and will be committed by a user/driver of **TV6** and **TV7**, and that the **Target Vehicles** described herein has been used in furtherance of those offenses.

### SUMMARY OF PROBABLE CAUSE

17.     The United States, including the Drug Enforcement Administration, is conducting a criminal investigation regarding possible violations of 21 U.S.C. 841, 846. This request for search warrants relates to an investigation into individuals distributing illegal drugs in Whatcom County and elsewhere.  The investigation is being conducted by the Drug Enforcement Administration (DEA) Bellingham Resident Office and other state, local, and federal agencies.

18.     Starting in October of 2018, investigators with DEA Bellingham, the Whatcom County Gang and Drug Task Force (WGDTF) and the Skagit County Inter-local

AFFIDAVIT OF SA Smith - 7
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Drug Enforcement Unit (SCIDEU), began an investigation into a drug distribution organization operating in Whatcom County, Washington. One of the members of this organization was identified as Wayne BISBEE. On October 30, 2019, a Search and Seizure Warrant for BISBEE's Facebook account was submitted to and authorized by United States Magistrate Judge Paula McCandlis. As a result of the search of BISBEE's Facebook account, investigators identified Jaime HERNANDEZ[1] as a drug source of supply for BISBEE.

19.     On January 17, 2020, Chief U.S. Magistrate Judge Brian A. Tsuchida authorized a Search and Seizure Warrant for Jaime HERNANDEZ's Facebook Account. A subsequent search of Jaime HERNANDEZ's Facebook account revealed that Jaime HERNANDEZ had drug conversations with Janaye CLAUSEN and Jesus David RENDON DUARTE.

20.     On March 19, 2020, United States Magistrate Judge Paula McCandlis authorized a Search and Seizure Warrant for CLAUSEN's Facebook Account. Similarly, on April 6, 2020, United States Magistrate Judge Paula McCandlis authorized a Search and Seizure Warrant for Jesus David RENDON DUARTE's Facebook Account. A review of these accounts indicated that CLAUSEN was a narcotics redistributor in Whatcom County Washington and that RENDON DUARTE was a supplier to individuals (such as Jaime HERNANDEZ) known by law enforcement to live in Whatcom County

21.     In May of 2021, a DEA undercover officer began communication with the male user of a cell phone for the purpose of purchasing suspected fentanyl-laced pills. As the investigation continued, investigators learned the male communicating with the DEA undercover officer appeared to be directing a network of drivers to deliver narcotics in the area of Western Washington. Investigators suspect the male is based in Mexico.

---

[1] In 2022, Jaime HERNANDEZ pled guilty to federal drug trafficking charges.

AFFIDAVIT OF SA Smith - 8
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

22.     Since first making contact with the male source of supply believed to be located in Mexico, known to the UC as "Cuete", investigators have conducted approximately nine controlled purchases organized by "Cuete." Each controlled purchase has been conducted in roughly the same manner. The UC would contact "Cuete" and agree on a quantity of pills, price and location to meet. The UC would meet an individual at the agreed upon location, obtain the pills and pay the individual. The individual would arrive in a vehicle, and the meeting location would occur in a public parking lot. The UC does not have direct telephonic contact with the individual delivering the drugs. Two recent transactions are described below. On February 12, 2022, the UC received a text message from phone number 619-372-4352 (TT14). The text message said that TT14 was the user's new number. The UC understood TT14 to be Cuete's knew phone number. At a later date, the UC talked to the user of TT14 on the phone and recognized the user's voice as Cuete.

23.     TT13, a phone investigators believe is being used by Janaye CLAUSEN, and **TT16**, a phone investigators believe is being used by a drug courier or "runner" for "Cuete," are both in contact with TT14. Investigators seek the authority to learn Prospective Location Information (PLI) for **TT16**, as well as the authority to track two vehicles (**TV6** and **TV7**) that investigators believe are being used to deliver controlled substances.

Controlled Purchase of 300 pills in October 2021

24.     In September 2021, the UC received a text message from (602) 664-0276 which read "Hi, I'm Cuete, this is my new number." The UC understood this to mean that the source of supply who the UC had previously ordered drugs from had obtained a new number.

25.     In October 2021, the UC contacted "Cuete" multiple times and arranged to purchase 300 pills from "Cuete's" runner. Based on communications between the UC and "Cuete," investigators identified that "Cuete's" runner was driving a white Nissan

AFFIDAVIT OF SA Smith - 9
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pathfinder (WA/BZH4766) (TV5).[2]  On the same day, the UC met "Cuete's" runner in a public parking lot in Kirkland, Washington. The UC got into TV5 and purchased 300 pills for $1350. It was the first time the UC had seen TV5 or met with that runner. The runner, a Hispanic male, was not identified.

26.      According to the Washington Department of Licensing, TV5 is a 2001 White Nissan Pathfinder, registered to Charles Bruce Teton at 2998 Smokehouse Road, Bellingham, Washington 98226.[3]  Investigators reviewed a photograph of the registered owner and determined that the individual who delivered the pills to the UC was not the registered owner.

27.      The pills purchased on this occasion were blue in color, marked "M" on one side and "30" on the other.  Based on training, experience and the previous controlled purchases conducted from this organization, I know that these pills are consistent in appearance to other pills purchased from this organization that have tested positive for the presence of fentanyl.

Controlled Purchase of approximately 340 pills in December 2021

28.      In December 2021, the UC contacted "Cuete" multiple times and arranged to purchase about 340 pills from "Cuete's" runner.  The UC agreed to meet "Cuete's" runner at a business parking lot in Bellevue, Washington. After arranging the meeting, investigators saw the same white Nissan Pathfinder (TV5) drive through the parking lot and park.  The UC got into the passenger seat of TV5 and met with the runner. The UC recognized the Hispanic male runner as the same male the UC had met with in October, 2021.  The UC purchased approximately 340 pills for $1,350 from the same individual, in TV5, who sold the UC pills in October 2021.

29.      The pills purchased on this occasion were blue in color, marked "M" on one side and "30" on the other.  These pills were consistent in appearance to the pills

---

[2] This is a different white Nissan Pathfinder than **TV6**.

[3] This is the same registered address as **TV6**.

purchased in October 2021 and to other pills purchased from this organization that have tested positive for the presence of fentanyl.

30.     Investigators continued to follow TV5 after the UC controlled purchase and observed the driver of TV5 conduct multiple additional suspected drug transactions before stopping at a hotel and use a key to access a room.

Controlled Purchase of approximately 300 pills on March 3, of 2022

31.     As previously mentioned, in February of 2022, the UC received a text message from TT14 indicating that Cuete obtained a new number.  In March of 2022, the UC and the user of TT14 were in contact multiple times as the UC arranged to purchase approximately 300 pills from the "Cuete's" runner.[4]  On March 3, 2022, the UC agreed to meet a runner in a parking lot in Bellingham, Washington.  The UC was told that the driver would arrive in a white truck (**TV6**) and that the driver was wearing a black jacket.

32.     At approximately 1:31 p.m., the UC parked in the agreed upon parking lot in anticipation of the controlled purchase and surveillance was established in the area.

33.     At approximately 1:50 p.m., investigators saw a male with black pants and a black jacket walk from the area of an apartment complex to the UC's vehicle. Simultaneously, the UC was on the phone with "Cuete", and the UC saw a Hispanic male wearing black pants and a black jacket walk towards the UC vehicle; the UC conversation with Cuete ended prior the male arriving at the UC vehicle.  The male entered the UC vehicle and the UC listened as the male was talking on the phone.  The UC recognized the voice of the person that the male was talking to as that of Cuete.  A later review of TT14's toll records confirmed that TT14 was on a call with a number elsewhere designated TT15**,** were on a call shortly after the UC and TT14 ended their call.  Based on training and experience, the UC's recognition of Cuete's voice on the male's phone (as the male was in the UC vehicle), and the toll records indicating that

---

[4] Some of these communications were via phone call and it was during this time that the UC identified the voice of the user of TT14 as being Cuete's.

AFFIDAVIT OF SA Smith - 11
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Cuete (TT14) was talking to TT15 while the male was in the UC vehicle, investigators believe that male who met with the UC was using TT15 and is a runner for Cuete.

34.     While in the vehicle, the male finished the phone conversation with Cuete, and the male counted the money ($1200) provided by the UC.  In turn the male provided four bundles of blue pills marked "M" on one side and "30" on the other.  The male then got out of the UC car and walked towards the apartment complex.

35.     Other law enforcement conducting surveillance saw the male leave the UC vehicle, walk across the street to the apartment complex parking lot, briefly access **TV6**, and then walk into apartment 209 at the complex.  It should be noted that TT15 was subscribed to 956 N Garden Street Apartment 209, Bellingham, Washington, which is the same apartment the runner walked into following the controlled purchase.

36.     At approximately 2:27 p.m., surveillance units saw the male the UC purchased pills from return to **TV6**, get into **TV6**, and leave the area.  Surveillance units followed **TV6** as it stopped at a T-Mobile store before driving north through Bellingham before taking Interstate 5 south out of Bellingham.  Based on training and experience, investigators believe the route that the driver of **TV6** took was consistent with conducting counter-surveillance.  Law enforcement followed **TV6** south for several miles before ending surveillance.

37.     A review of TT14's (Cuete) tolls showed that on the day of the controlled purchase, TT14 was communicating with TT15 before, during, and after the deal. For instance, a few minutes after the UC and Cuete (TT14) exchanged text messages on the morning of the controlled purchase, Cuete made a call to TT15.  A similar pattern appeared throughout the morning of March 3, 2022 and leading up to the controlled purchase.  The UC had approximately 35 communications (voice and text) with Cuete (TT14) arranging the controlled purchase and in between those approximately 35 communications, TT15 had approximately 25 communications with Cuete (TT14). Based on training and experience, as well as the way Cuete runs his operations from Mexico, investigators believe that Cuete was communicating with the user of TT15,

AFFIDAVIT OF SA Smith - 12
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

believed to Cuete's runner, in an effort to facilitate a meeting between the UC and the runner.

March 30, 2022, PLI and Vehicle tracker warrants

38.     On March 30, 2022, United States Magistrate Judge Paula McCandlis signed a prospective location information (PLI) warrants and a vehicle tracking warrant for TT13, TT15, and **TV6**.

39.     In the following days, investigators began receiving PLI data for both TT13 and TT15.  The PLI data received for TT15 showed the phone, and likely its user, were consistently south of Seattle, Washington, indicating the Cuete's runner was staying in that area.  However, the PLI data was not accurate enough to determine the precise location of the user.  Investigators anticipated using the PLI data to locate **TV6** and subsequently install the court authorized vehicle tracker.  However, given the lack of more precise PLI data, investigators were unable to use PLI data from TT15 to find **TV6**.  Ultimately, investigators were unable to locate **TV6** and install the tracker within the court established timeframe (April 9, 2022).

Identification of **TV7** and **TT16**

40.     On April 11, 2022, investigators saw that PLI data for TT15 indicated the courier was driving north towards Bellingham, Washington.  Investigators established surveillance in the area of 965 N. Garden Street, anticipating the runner would return to the area in **TV6**.[5]  While conducting surveillance in the area, law enforcement saw **TV7** pull into the apartment complex at 965 N. Garden Street, Bellingham, Washington.  A few moments later, investigators saw Cuete's runner get out of **TV7**, walk up to apartment #209, and knock on the door.  After no one answered the door, the runner returned to **TV7** and left the area.  Some law enforcement continued surveillance at the apartment complex while other law enforcement followed **TV7**.

_____
[5] As described above, this is the same area the UC previously conducted a controlled purchase with the runner.

AFFIDAVIT OF SA Smith - 13
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     After the runner left the apartment complex in **TV7**, investigators watched a Hyundai Sonata pull into the parking lot and park, and a passenger, later identified as Joshua PHAIR get out of the front passenger seat of the Hyundai.  A few minutes later, PHAIR returned to the front passenger seat of the Hyundai, and the vehicle left the area. Around the same time, investigators briefly lost sight of **TV7** before locating it again at a local gas station.  Law enforcement saw the runner outside of the vehicle at a food truck and watched as he returned to the **TV7**.  A few moments later, investigators saw the same Hyundai from the apartment complex pull into the gas station parking lot where **TV7** was parked.

42.     While at the gas station, investigators watched as the driver of the Hyundai, identified as Christopher PHAIR, got out of the Hyundai with a shoulder bag, walk to **TV7**, and get in the front passenger seat of **TV7**.  After a few minutes, law enforcement watched as Christopher PHAIR got out of the passenger seat of **TV7** and returned to the Hyundai where it departed the gas station and returned to the parking lot at 965 N. Garden Street.  Once back at that location, investigators saw both Christopher and Joshua PHAIR get out of the Hyundai and enter apartment #209.  Other investigators followed the runner in **TV7** as it headed south on the interstate out of Bellingham.

43.     Based on training and experience, as well as law enforcement's history of purchasing drugs from Cuete's runner, investigators believe they observed drug deal between Christopher PHAIR and the Cuete's runner, who used **TV7** to transport the drugs to Bellingham and in which the suspected drug transaction took place.

44.     It should be noted that the previous phone used by Cuete's runner was TT15, described above, and that Christopher PHAIR was the subscriber of that phone. This indicates to investigators that Christopher PHAIR used his name to obtain a phone for the Cuete's runner.  Based on training and experience, law enforcement knows that it is common for drug dealers to use phones subscribed to other people, so as to mislead law enforcement of their true identity; investigators believe that is what Cuete's runner was doing in this situation.

AFFIDAVIT OF SA Smith - 14
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Identification of **TT16** as new runner phone

45.     Pen Register Trap/Trace data for Cuete (TT14) showed that TT15 stopped communicating with Cuete on or about April 13, 2022.  That same day, Cuete started communicating with **TT16**.  Between April 13, 2022, and May 1, 2022, Cuete and **TT16** communicated approximately 1313 times; **TT16** was Cuete's most frequent contact during that span.  Based on this investigation, toll data has repeatedly shown that Cuete's most frequent contact has been his runner.

46.     As of May 1, 2022, **TT16** had a total of 46 different phone numbers it had been in contact with.  A common call analysis showed that of those 46, TT15 and **TT16** had 10 common callers.  In other words, approximately 21% of **TT16**'s contacts in roughly the first two weeks of **TT16**'s activation, were the same numbers TT15 was in contact with.  This indicates to investigators that the user of TT15 is likely the same user as **TT16**.

47.     Based on training and experience, the history of this case, common call analysis, and the fact that TT15 stopped communicating with Cuete the same day **TT16** started communicating with Cuete, indicates to investigators that Cuete's runner is now using **TT16** to arrange drug deals.

## IV.     KNOWLEDGE BASED ON TRAINING AND EXPEREINCE

48.     Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, to include their use of cellular phones and other electronic communication devices to facilitate their trafficking activity.  I know drug traffickers use cellular phones to communicate with suppliers, re-distributors, and customers.  These communications via cellular phone often include discussing details around drug deals such as time and place of drug transactions, types of drugs, amounts of drugs, methods of payment for drugs, and quality of drugs sold or bought, amongst other things.  I know that it is common for drug traffickers to use multiple phones as well as change phone numbers regularly.  They use different

AFFIDAVIT OF SA Smith - 15
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

telephones to help compartmentalize their drug trafficking activities. This might entail using specific phones for their personal life and other phones for drug activity. Or it might include using different phones for different individuals or aspects of their business, such as using certain phones to contact suppliers and other phones to contact redistributors. This compartmentalizing is especially common for individuals in leadership positions. Drug traffickers often try to keep the various components and organization members separate to protect parts of the organization from detection by law enforcement. For example, if one individual or arm of a drug trafficking organization (DTO) is arrested or seeks to assist law enforcement, that person could do less damage to the organization if the leadership limits what he or she knows about other parts of the DTO. Drug traffickers also use multiple cell phones to frustrate law enforcement interception and monitoring. Where there are multiple cell phones, law enforcement may learn of one part of the organization's activities by intercepting one phone, but they would not receive information as to the overall activities of the DTO. Thus, the use of multiple cell phones helps the survival of the overall organization.

49.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

50.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the

cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

51.     Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

52.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network.  When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication.  Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

53.     In my training and experience, I have learned that T-Mobile, AT&T, Verizon Wireless, and Sprint are companies that provide cellular telephone access to the general public.  I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known

AFFIDAVIT OF SA Smith - 17
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

54.     Based on my training and experience, I know that T-Mobile, AT&T, Verizon Wireless, and Sprint, can collect E-911 Phase II data about the location of the Target Telephones, including by initiating a signal to determine the location of the Target Telephones on their networks (T-Mobile, AT&T, Verizon Wireless, and Sprint) or with such other reference points as may be reasonably available.

55.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

56.     Based on my training and experience, I know that T-Mobile, AT&T, Verizon Wireless, and Sprint can collect cell-site data about Target Telephones. Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular

devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

57.     Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE, Timing Advance, and TruCall.  RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

58.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Telephone**'s user or users and may assist in the identification of co-conspirators and/or victims.

59.     Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone.  These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone.  To provide for any such changes made to the

AFFIDAVIT OF SA Smith - 19
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Target Telephones, Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

## AUTHORIZATION REQUEST FOR TARGET TELEPHONES

60.     Based on the fact in this affidavit, there is probable cause to conclude that violations of 21 U.S.C §841 and §846 (distribution of controlled substances and conspiracy to distribute controlled substances) have been committed, are being committed, and will be committed by user of **TT16**, and others who are known and unknown. The requested information, including prospective location information, for **TT16** will help law enforcement monitor the user of the **Target Telephones**, follow their movements when they are at locations that are otherwise hard for law enforcement to observe, and identify other coconspirators, sources of supply, storage locations, and other people and places of evidentiary value. There is probable cause to believe that the use of the technique described by the warrant will result in officers learning that information.

61.     Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap order for the **Target Telephone**, i.e., for T-Mobile, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and 18 U.S.C. § 3123.

62.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

AFFIDAVIT OF SA Smith - 20
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

delay notice to the subscriber or user of the **Target Telephone** until 90 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

63.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachments B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The agency shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

64.     Pursuant to 18 U.S.C. § 2703(g), the government will execute these warrants by serving the warrant on T-Mobile.  Because the warrant will be served on T-Mobile, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  I therefore

AFFIDAVIT OF SA Smith - 21
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephone** outside of daytime hours.

## AUTHORIZATION REQUEST FOR TARGET VEHICLE

65.     As set forth above, based on the facts set forth in this affidavit, there is probable cause to conclude that violations of 21 U.S.C § 841 and § 846 (distribution of controlled substances and conspiracy to distribute controlled substances) have been committed, are being committed, and will be committed by the driver of **TV6** and **TV7**, and others.  Tracking the location of **TV6** and **TV7** will help law enforcement monitor its users, follow their movements when they are at locations that are otherwise hard for law enforcement to observe, and identify other coconspirators, sources of supply, storage locations, and other people and places of evidentiary value.  There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

66.     As discussed above, I am requesting permission to install/service the trackers at any time, day or night, in order to ensure that we can do so covertly and avoid jeopardizing the ongoing investigation.  Because we believe early morning hours or later evening hours are the safest time for installation and access to the vehicle, we request nighttime authorization.  Additionally, we request to be authorized to access the following addresses to install or maintain the tracking device:

       a.     2998 Smokehouse Road, Bellingham, Washington, 98226.

       b.     956 N. Garden Street, Apt. 209, Bellingham, Washington, 98225

       c.     2360 S Ash Street, Tacoma, Washington, 98405

67.     I seek authority to do the following: (a) install, remove, monitor, repair, or adjust a global positioning satellite (hereinafter GPS) electronic tracking device on to **TV6** and **TV7** at any time of the day or night; (b) if necessary to protect the safety of person installing, removing monitoring, repairing, or adjusting the electronic tracking device on **TV6** and **TV7**, or to protect the integrity of the investigation, to surreptitiously enter the subject vehicle at any time of the day or night, and move the subject vehicle

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  from one location to another for the purpose of installing, removing, monitoring,

2  repairing, or adjusting the device; and/or to tow the vehicle; (c) surreptitiously re-enter

3  **TV6** and **TV7** at any time of the day or night, for the purpose of installing, removing,

4  monitoring, repairing, or adjusting the device; and (d) continuously monitor any and all

5  signals emitted from the electronic tracking device in any jurisdiction within the United

6  States, including when the vehicle enter any structure or private property in which there

7  may be a reasonable expectation of privacy.  I request this authorization for a period of

8  up to forty-five (45) days.

9       68.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of

10  Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

11  delay notice to the owner(s) or user(s) of the Target Vehicle until 90 days after the

12  collection authorized by the warrant has been completed.  There is reasonable cause to

13  believe that providing immediate notification of the warrant may have an adverse result,

14  as defined in 18 U.S.C. § 2705.  Providing immediate notice to the user(s)/owner(s) of

15  the Target Vehicle would seriously jeopardize the ongoing investigation, as such a

16  disclosure would give that person an opportunity to destroy evidence, change patterns of

17  behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).

18

19                                    Ryan C. Smith, Affiant

20                                    Special Agent

21                                    Drug Enforcement Administration

22

23  The above-named agent provided a sworn statement to the truth of the foregoing affidavit

24  by telephone on this 18th day of May, 2022.

25

26                                    PAULA McCANDLIS

27                                    United States Magistrate Judge

28

AFFIDAVIT OF SA Smith - 23
USAO 2021R01230

1

**EXHIBIT 1**

2

3

<u>DECLARATION</u>

4

I, Stephen Hobbs, declare as follows:

5        1.      I am a duly appointed Assistant United States Attorney for the Western

6   District of Washington, and I have primary responsibility for representing the interests of

7   the United States herein.

8        2.      I make this declaration in support of an application for a search warrant

9   pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with

10  an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.

11       3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the DEA is the law

12  enforcement agency conducting the investigation in this matter and that the information

13  likely to be obtained from the requested warrant is relevant to an ongoing criminal

14  investigation being conducted by that agency.

15       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

16  Application is made on the basis of information officially furnished, and on that basis I

17  verily believe such information to be true.

18       Executed this 18th day of May, 2022.

19

20                                    *s/ Stephen Hobbs*_____
                                      STEPHEN HOBBS
21                                    Assistant United States Attorney

22

23

24

25

26

27

28

EXHIBIT 1
Page   1   of   1
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A1**

**Property to Be Searched and Subscriber/Subject Information**

Records and information associated with the following cellular telephones

a. **Target Telephone 16 (TT16)**, assigned call number (206) 671-9948, subscribed to "Alex DIAZ" at 3926 Lozier Lane, SE Auburn, Washington, whose service provider is T-Mobile, a wireless service provider. T-Mobile is headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

In Attachment B, T-Mobile is referred to as the Wireless Provider.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A1. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.  **Section I:  Information to be Disclosed by as the Wireless Provider**

1.  **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

    a.  Names (including subscriber names, user names, and screen names);

    b.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    c.  Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

    d.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

    e.  Length of service (including start date) and types of service utilized;

    f.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.     Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.     **Prospective Cell Site Location Information.**

a.     All information about the location of the Target Telephone described in Attachment A1 for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A1.

b.     The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A1**.**

3.     **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.     All information about the location of the Target Telephone described in Attachment A1 for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A1.

b.     The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A1.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider. The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

furnishing such facilities or assistance.

**II.      Section II:  Information to Be Seized by the Government**

1.      All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.      All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.      Location Information regarding the Target Telephone described in Attachment A1.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

Attachment B
Page 3 of 3
USAO 2021R01230

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970